## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 26 2018, 7:25 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Teresa K. Hollandsworth
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of: N.R.V. (Minor Child)

and

N.M.V. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

February 26, 2018

Court of Appeals Case No.
45A05-1709-JT-2211

Appeal from the Lake Superior Court

The Honorable Thomas P. Stefaniak, Judge

Trial Court Cause No.
45D06-1609-JT-224

**Bradford, Judge.**

# Case Summary

[1] Appellant-Respondent N.M.V. ("Mother") appeals the juvenile court's order terminating her parental rights to N.R.V. ("the Child"). Appellee-Petitioner the Indiana Department of Child Services ("DCS") became involved in the Child's life after the Child's father, who had custody of the Child, was murdered. At the time, Mother was a minor and a ward of DCS. The Child was subsequently determined to be a child in need of services ("CHINS") and Mother was ordered to complete certain services. Mother, however, failed to successfully complete the court-ordered services.

[2] DCS filed a petition seeking the termination of Mother's parental rights to the Child on October 7, 2016. Following an evidentiary hearing, the juvenile court issued an order granting DCS's petition. On appeal, Mother contends that DCS did not provide sufficient evidence to support the termination of her parental rights. We affirm.

# Facts and Procedural History

[3] The Child was born on December 23, 2011. At the time, Mother was thirteen or fourteen years old and lived with her mother. Shortly after the Child's birth,

Mother became a ward of DCS after she was removed from her mother's care. The Child was then placed with C.B. ("Father").[1]

[4] On October 17, 2014, Father was murdered during an attempted break-in or robbery. The Child was in Father's care at the time and was a witness to the murder. Despite her young age, the Child remembers the murder and, as of the date of the evidentiary hearing, continued to suffer from post-traumatic stress disorder.

[5] Following Father's murder, DCS again became involved with the Child. At the time, Mother remained a ward of DCS and was living in a residential placement in Indianapolis. The Child was taken into DCS custody and placed in foster care after DCS determined that there was no appropriate relative family placement for the Child. The Child was subsequently found to be a CHINS. As a result of the CHINS finding, Mother was ordered to complete a number of services. Mother failed to successfully compete these court-ordered services.

[6] On October 7, 2016, DCS filed a petition seeking the termination of Mother's parental rights to the Child. The juvenile court conducted an evidentiary hearing on DCS's petition on August 22, 2017. During the evidentiary hearing, Mother acknowledged that she had not seen the Child in approximately three years. DCS presented evidence indicating that (1) Mother has a history of

---

[1] The record indicates that Father was seventeen years old when the Child was born.

instability and drug use, (2) Mother failed to participate in services, (3) Mother has failed to engage in visitation with the Child and essentially had no relationship with the Child, (4) the termination of Mother's parental rights was in the Child's best interest, and (5) DCS's plan was for the Child's current pre-adoptive family to adopt the Child.

[7] Following the conclusion of the hearing, the juvenile court took the matter under advisement. On August 30, 2017, the juvenile court issued an order terminating Mother's parental rights to the Child. This appeal follows.

# Discussion and Decision

[8] The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id.* Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

## Sufficiency of the Evidence

Mother contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating her parental rights to the Child. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it.

*Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[12] In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A) one (1) of the following exists:
> > (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
> > (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
> > (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
> (B) that one (1) of the following is true:
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)  termination is in the best interests of the child; and

(D)  there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  In challenging the sufficiency of the evidence, Mother claims that the evidence is insufficient to prove the second and third elements set forth in Indiana Code section 31-35-2-4(b)(2).[2]

## A.  Indiana Code Section 31-35-2-4(b)(2)(B)

[13]  On appeal, Mother argues that DCS failed to establish by clear and convincing evidence both that the conditions leading to the Child's continued placement outside her home would not be remedied and that there is a reasonable probability that the continuation of the parent-child poses a threat to the well-being of the Child.  It is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find either that (1) the conditions resulting in removal from or continued placement outside the parent's home will not be remedied, (2) the continuation of the parent-child relationship poses a threat to the child, or (3) the child has been adjudicated CHINS on two separate occasions.  *See In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*.  Therefore, where the juvenile court determines one of the above-mentioned factors has been proven and there is

---

[2]  Mother also briefly suggests that the evidence in insufficient to prove the fourth element set forth in Indiana Code section 31-35-2-4(b)(2).  Mother, however, did not present any argument in support of this brief suggestion and has therefore waived any challenge to the sufficiency of the evidence to prove the fourth factor.  *See Dean v. Dean*, 439 N.E.2d 1378, 1385 (Ind. Ct. App. 1982) (providing that failure to present cogent argument or to cite pertinent authority on an issue results in waiver on appeal).

sufficient evidence in the record supporting the juvenile court's determination, it is not necessary for DCS to prove, or for the juvenile court to find, either of the other two factors listed in Indiana Code section 31-34-2-4(b)(2)(B). *See In re S.P.H.*, 806 N.E.2d at 882.

### *Whether Conditions Will Be Remedied*

[14] In order to determine whether the conditions will be remedied, the juvenile court should first determine what conditions led DCS to continue the Child's placement outside parent's care, and, second, whether there is a reasonable probability that those conditions will be remedied. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*; *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying the child's continued placement outside her parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.*

[15] A juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the

parent and the parent's response to those services.'" *Id*. (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)). The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[16] In determining that the conditions leading to the Child's continued placement out of Mother's care would not be remedied, the trial court found that Mother (1) was not providing any emotional or financial support for the Child, (2) has not completed any of the court-ordered services that would be necessary prior to reunification, (3) has not visited with or developed any relationship with the Child, (4) was in no position to properly parent the Child, and (5) has not shown any long-term stability in her life. (Appellant's App. Vol. II, p. 58) The evidence supports these findings.

[17] Again, DCS became involved with the Child after Father was murdered. It is undisputed that at the time of Father's death, Mother was a ward of DCS and was unable to care for the Child. While a ward of DCS, Mother lived in numerous different placements. Mother ran away from a number of these placements and was on run-away status when her wardship was terminated upon her reaching the age of majority.

[18] Mother testified that prior to the evidentiary hearing, she had secured housing and employment. Mother's habitual patterns of conduct, drug use, and

instability support the juvenile court's concerns regarding the likeliness that Mother would retain stable housing and employment long-term. Even assuming Mother could retain her stable housing and employment, the record is devoid of any evidence suggesting that Mother had taken any of the steps necessary to learn how to provide the appropriate and necessary care for the Child.

[19] Mother admitted that she had not seen the Child in approximately three years and that she did not have any relationship with the Child. Mother, however, argued "but that doesn't mean that I can't work up a relationship with her. I haven't had the chance to." Tr. Vol. II, p. 23. The record reveals that contrary to Mother's argument, she has had numerous opportunities to develop a relationship with the Child, but chose not to.

[20] Mother acknowledged that she did not participate in the services offered to her and that she ran away to avoid participation in these services. When asked during the evidentiary hearing why she had run away, Mother stated the following:

> I don't know. I guess, because at the time I was -- I'm still really young, but at the time I was really young, and I didn't know. Like, nobody ever taught me how to be a mother, because I never had a mom. But, I didn't know. I just pretty much gave up and I just left her alone. But, now I realize, like, I can't just do that. I can't just leave my daughter in DCS custody or with a foster mom. So, I'm just ready to try again. And at the time I wasn't ready, but now I am.

Tr. Vol. II, pp. 12–13. Mother further acknowledged that she had used marijuana her "whole life" but claimed that she had not used marijuana in the three months prior to the evidentiary hearing. Tr. Vol. II, p. 12.

[21] It is well-established that the juvenile court, acting as a trier of fact, was not required to believe or assess the same weight to the testimony as Mother. *See generally, Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993) (providing that it is for the trier of fact to determine which witnesses to believe or disbelieve). Mother's challenge to the sufficiency of the evidence to support the conclusions of the juvenile court effectively amount to an invitation for this court to reassess witness credibility and reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

[22] Upon review, we conclude that the juvenile court did not err in concluding that the conditions leading to the Child's continued placement outside Mother's care were unlikely to be remedied. Having concluded that the evidence was sufficient to support the juvenile court's determination, and finding no error by the juvenile court, we need not consider whether the continuation of the parent-child relationship poses a threat to the Child's well-being because DCS has satisfied the requirements of Indiana Code section 31-35-2-4(b)(2)(B) by clear and convincing evidence.

## B. Indiana Code section 31-35-2-4(B)(2)(C)

[23] Mother also argues that DCS failed to establish by clear and convincing evidence that termination of her parental rights is in the Child's best interests.

We are mindful that in considering whether termination of one's parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In doing so, the juvenile court must subordinate the interests of the parent to those of the child involved. *Id*. Furthermore, this court has previously determined that the testimony of the case worker, a GAL, or a CASA regarding the child's need for permanency supports a finding that termination is in the child's best interests. *Id*.; *see also Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied*.

[24] Linda Roberts, the DCS case worker assigned to the Child's case, testified that she believed termination of Mother's parental rights was in the Child's best interests. (Tr. Vol. II, p. 58) Specifically, Roberts testified that

> Because [the Child] needs stability, she needs permanency. She doesn't need to be moved around a lot. She doesn't like change. When she has to -- even when she's changed therapists, or something changes at school, she gets agitated. She gets very upset. But, she doesn't deal well with change.

Tr. Vol. II, p. 58. Roberts indicated that the pre-adoptive foster mother wishes to adopt the Child and "has been very consistent with [the Child]. She makes sure her physical and her emotional needs are met. She is very caring. And she really gives [the Child] a lot of attention. And she has -- her and her family have bonded with [the Child]." Tr. Vol. II, p. 58.

[25] In addition, the Child's therapist testified that it was in the Child's best interests to remain with pre-adoptive foster mother. The Child's therapist further testified that the Child has no memories of Mother. He opined that the Child will likely require long-term therapy and that it would not be "a great idea" to remove the Child from her current placement because "[i]t's time for her to be stabilized." Tr. Vol. II, p. 49.

[26] The juvenile court found that given Mother's lack of consistency, Mother's lack of "participation and overall failure to bond with [the Child] have to be considered" in any determination regarding the Child's best interests. Appellant's App. p. 58. The juvenile court further found as follows:

> Mother would waiver [sic] back and forth over the years of wanting to parent her child or wanting to give up her rights to her child. The Court cannot gamble on this child's future. Mother has shown no consistency in her life and has made very little effort[ ] to parent her child. Mother has not shown consistent interest in her child over the last three years.

Appellant's App. Vol. II, p. 58. The juvenile court concluded that the Child "deserves permanency," noting that the Child's "permanency and well-being that is being provided in the pre-adoptive foster home … is needed to be continued and made permanent" as any disruption of the relationship between the Child and pre-adoptive foster mother "would be extremely confusing, hurtful, and scary for [the Child]." Appellant's App. Vol. II, p. 58. In reaching this conclusion, the juvenile court further noted that the Child is "bonded and thriving" in her current placement. Appellant's App. Vol. II, p. 58.

The juvenile court's conclusion regarding the Child's need for permanency is supported by the evidence. The juvenile court did not have to wait until the Child was irreversibly harmed such that her physical, mental, and social development was permanently impaired before terminating Mother's parental rights. *See In re C.M.*, 675 N.E.2d at 1140. In light of the testimony of the Child's case manager and therapist, we conclude that the evidence is sufficient to satisfy DCS's burden of proving that termination of Mother's parental rights is in the Child's best interests. Again, Mother's claim to the contrary merely amounts to an invitation for this court to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

# Conclusion

Having concluded that the evidence is sufficient to support the juvenile court's order terminating Mother's parental rights to the Child, we affirm the judgment of the juvenile court.

The judgment of the juvenile court is affirmed.

Robb, J., and Crone, J., concur.